**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 21-480 |
| DYRAN DAVENPORT, | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OPINION</u>

Presently before the Court is Defendant Dyran Davenport's Motion to Dismiss for a Violation of the Constitutional Right to a Speedy Trial and Unnecessary Delay in Bringing a Defendant to Trial and Violation of a Fair Trial (the "Delay Motion"), in which he contends that the Indictment against him should be dismissed because his Sixth Amendment right to a speedy trial has been violated. (Docket No. 51). The Government filed a Response in opposition thereto, Defendant filed a Reply and the Court held a motion hearing on November 8, 2023, the official transcript of which was filed of record. (Docket Nos. 56 at 19-20; 60 at 2-10; 79). At the Court's direction, the parties submitted post-hearing proposed findings of fact and conclusions of law and briefing relative to Defendant's Delay Motion, followed by each party's response to the opposing party's post-hearing submission. (Docket Nos. 84 at 7-9, 14-17; 86 at 1-21; 88 at 6-9; 90 at 1-16). After all post-hearing submissions were complete, the Court took the matter under advisement. (*See* Docket No. 91). After careful consideration of the parties' submissions, the transcript of the proceedings and the credible evidence of record, and for the following reasons, Defendant's Delay Motion will be granted, and the Indictment in this case will be dismissed with prejudice. Given this ruling, Defendant's other Pretrial Motions will be denied as moot.

I.      **BACKGROUND**

    A.  **Procedural History**

In 2021, Defendant originally was charged by Information in the Court of Common Pleas of Allegheny County, Pennsylvania with various controlled substance offenses, carrying a firearm without a license, fleeing or attempting to elude an officer, escape, and various vehicle code violations, for conduct that occurred on November 18, 2020.  (Docket No. 56-1).  Following Defendant's filing of a motion to suppress evidence, the Allegheny County District Attorney submitted the Commonwealth's Petition for Nolle Prosse to the state court on June 23, 2021, which the court approved that same day.  (Docket No. 56-2).

Thereafter, on November 17, 2021, Defendant was charged in a two-count Indictment in this case with possession with intent to distribute 40 grams or more of a mixture and substance containing detectable amounts of heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi) and 841(b)(1)(C), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), both for conduct occurring on or about November 18, 2020.  (Docket No. 3).  An arrest warrant for Defendant was issued on November 17, 2021.  (Docket No. 7).  The arrest warrant was returned executed 16 months later on March 16, 2023.  (Docket No. 14).  Defendant made an initial appearance on that same date, and Assistant Federal Public Defender Andrew Lipson was appointed to represent him.  (Docket Nos. 12, 15).

Defendant subsequently was arraigned on March 20, 2023, at which time he declined to enter a plea to the charges.  (Docket Nos. 18, 21).  A detention hearing was waived, and Defendant has remained in pretrial detention since that time.  (Docket No. 24).

At a status conference held on March 30, 2023, the Court addressed with Defendant and AFPD Lipson the status of their relationship, among other issues pertinent to the case.  (Docket

No. 26).  At that time, Defendant and AFPD Lipson indicated that they would continue working together.  (*Id.*).  During the proceeding, Defendant asserted challenges to the Court's subject matter and personal jurisdiction, seeking dismissal of the case and requesting that he be immediately released, which the Court construed as an oral motion to dismiss the indictment and denied without prejudice.  (*Id.; see also* Docket Nos. 27, 28).

On July 31, 2023, the Court held another status conference and hearing on Defendant's request to proceed *pro se*.  (Docket No. 45).  After conducting a colloquy with Defendant, the Court found that Defendant's waiver of counsel was knowing and voluntary and granted his request to represent himself.  (Docket Nos. 45, 48).  The Court also appointed AFPD Lipson as standby counsel for Defendant.  (Docket No. 49).

Ultimately, Defendant filed the Delay Motion and several additional pretrial motions, which the Government has opposed: Motion to Dismiss for a Defect in Instituting the Prosecution; Motion to Dismiss for Lack of Jurisdiction; and Motion to Suppress Evidence.  (Docket Nos. 50, 51, 53, 54, 56).  The Court scheduled a hearing on Defendant's suppression motion and oral argument on Defendant's Motions to Dismiss on November 8, 2023.  (Docket No. 61).  Defendant subsequently moved for an evidentiary hearing on his Delay Motion, which the Court granted and held on November 8th, along with oral argument on his Motions to Dismiss.[1]  (Docket Nos. 63, 66, 67).

Turning to the parties' arguments on the Delay Motion, Defendant contends that the Indictment in this case should be dismissed because his Sixth Amendment right to a speedy trial

---

[1]    Despite the Court's order specifically scheduling a suppression hearing on November 8th, the hearing could not proceed that day because the Government explained that it did not perceive a factual dispute relative to Defendant's Motion to Suppress Evidence, thus a necessary witness was not present in Court.  (*See* Docket Nos. 61, 66).  Given same, the Court continued that portion of the proceeding and subsequently reconvened on November 29, 2023 for the suppression motion hearing.  (Docket Nos. 66, 77, 80).

has been violated considering the four-factor test established by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). (*See generally* Docket No. 51). According to Defendant, in the 16 months which elapsed from the Indictment until his arrest, the Government was not reasonably diligent in attempting to locate and apprehend him. (*Id*., ¶ 16). During that time, Defendant was unaware of the Indictment, and he was not intentionally evasive. (Docket Nos. 51, ¶ 13; 86 at 7; 90 at 3). Following his apprehension, Defendant timely and forcefully asserted his speedy trial rights by requesting to proceed *pro se* so that he could pursue his constitutional speedy trial claim, ultimately resulting in his filing of the Delay Motion. (Docket No. 51, ¶¶ 19-20). Finally, prior to Defendant's arrest, a witness who would have provided exculpatory testimony passed away, and Defendant had no reason to believe that it would have been necessary to preserve that witness' testimony given that the state case against him had been dismissed and he was unaware of the federal case. (Docket Nos. 51, ¶¶ 8-12, 18; 86 at 10-11; 90 at 6, 12-13). Consequently, Defendant maintains that his defense has been prejudiced because of the lost exculpatory testimony.

Conversely, the Government maintains that an analysis of the *Barker* factors weighs in its favor, thus the Indictment should not be dismissed because there was no unreasonable delay in arresting Defendant that violates the Sixth Amendment. (Docket Nos. 56 at 19-20; 84, ¶¶ 52, 56, 59, 62; 88 at 6). During the period between the Indictment and Defendant's arrest, the police reasonably pursued him, but efforts to locate him were frustrated because he was living elsewhere at least two months after the Indictment and onward. (Docket No. 84, ¶¶ 57, 58). Additionally, the Government contends that Defendant's vague assertions about prejudice concerning a deceased witness who could have exonerated him are insufficient to establish that his defense has been prejudiced. (Docket Nos. 84, ¶¶ 59, 60; 88 at 8-9).

4

As detailed at the outset, a transcript of the proceedings had been produced, and the parties' post-hearing submissions are complete. Accordingly, Defendant's Delay Motion is ripe for disposition.

**B. <u>Facts</u>**

At the hearing on Defendant's Delay Motion, the Government called DEA Task Force Officer and Pittsburgh Police Detective William Churilla, who testified concerning the steps he took to locate and arrest Defendant and was subject to cross-examination concerning same. (*See* Docket No. 79 at 37-55). The Government also entered two exhibits into evidence. (Docket Nos. 66-2, 66-3). In turn, Defendant entered three exhibits into evidence, testified on his own behalf, presented testimony by his aunt, Diana Davenport, and his uncle, Laneil Davenport, and all were subject to cross-examination. (Docket Nos. 66-4; 66-5; 66-6; 79 at 56-74, 84-88).

Before summarizing the testimonial evidence, the Court initially notes that it evaluates the credibility of the witnesses who testified at the hearing consistent with certain well-established principles. Broadly stated, at an evidentiary hearing on a pretrial motion, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted). More specifically, as finder of fact, the Court "is free to accept or reject any or all of a witness's testimony." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted). To that end, "[c]redibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and

testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic." *Id.* When a defendant testifies, his credibility is to be judged in the same way as any other witness, and a witness's testimony is not to be judged more or less credible because the witness is a law enforcement officer. *Id.* at 569-70 (citations omitted).

Guided by the foregoing principles, the Court now turns to the testimony adduced at the hearing, which is fairly summarized as follows. Detective Churilla has been a City of Pittsburgh Police Officer for 26 years, he currently works in the narcotics and vice unit, and he is assigned to the DEA as a task force officer. (Docket No. 79 at 37). Detective Churilla estimated that he has arrested over 1,000 people in his career. (*Id.*). Relatedly, Detective Churilla has conducted searches for individuals wanted for arrest, which involves checking "any type of records that would indicate that an individual is living at a residence," including their employment history and social media platforms. (*Id.* at 37-38).

Detective Churilla testified that he was familiar with Defendant's case and looked for him after the Indictment was filed in November 2021. (Docket No. 79 at 38). To that end, Detective Churilla conducted surveillance at "various times of days" on a residence at 419 Caldwell Street in Clairton, Pennsylvania, which was Defendant's last known address, but he did not see Defendant at those times. (*Id.* at 38, 40). Detective Churilla conceded that he could have knocked on the door at 419 Caldwell Street, but "it's at [his] discretion how [he] wanted to do it … we could have [knocked], but [he] didn't decide on doing it that way." (*Id.* at 53). Detective Churilla "probably" surveilled 419 Caldwell Street "at least a half dozen times," but he did not know the specific dates because he did not take any notes to document that information. (*Id.* at 49). Furthermore, he did not have any reports for surveillance at 419 Caldwell Street because nothing significant happened. (*Id.* at 48-49).

Detective Churilla also asked Clairton Police Office Connor Helinski, who is a Task Force Officer, to notify the other Clairton police officers that there was an arrest warrant for Defendant and to take him into custody if they saw him.  (Docket No. 79 at 38-39).  Detective Churilla saw Officer Helinski "daily" and asked whether "you guys [have] seen [Defendant] around," but he did not have any documentation concerning any such communications with Officer Helinski.  (*Id.* at 39, 48).  According to Detective Churilla's testimony, the Clairton police were at 419 Caldwell Street nine times in 2022, but Defendant was not present on those occasions.  (*Id.* at 45).

Detective Churilla further testified that law enforcement tried to locate Defendant by reviewing his social media accounts and employment history.  As to the former, Detective Churilla "believe[d]" that Officer Brown ran social media searches to identify whether and where Defendant was working.  (Docket No. 79 at 53).  As to the latter, Detective Churilla reviewed information from the Pennsylvania Department of Labor to determine whether Defendant may have been employed.  (*Id.* at 40-41).  According to Detective Churilla's testimony, Defendant did not pay taxes during the first three quarters of 2022, which indicates that he was not employed.  (*Id.* at 41).  As for the fourth quarter of 2022, Detective Churilla's research showed that Defendant had employment listed in the State of Missouri, which could have been a telemarketing job.  (*Id.* at 41, 42).  Based on this information, Detective Churilla indicated that he was not able to locate Defendant in 2022 through his employment.  (*Id.* at 42).  However, when Detective Churilla testified concerning Government Exhibit 2, which is a "PA Dept. of Labor and Industry Employment Query" dated November 7, 2023, (*see* Docket No. 66-3), he acknowledged that Defendant was employed "in the third quarter of 2021, which was the United Parcel Service." (Docket No. 79 at 42).  Although Detective Churilla acknowledged that "we could have used – went through the United Parcel Service and attempted to identify where he was living at," he

conceded that he did not follow up on Defendant's third quarter 2021 employment information. (*Id.* at 42, 46).

Detective Churilla additionally testified that Defendant obtained a gun license after his case was dismissed by the state court but before the Indictment was filed in this case. (Docket No. 79 at 43). As shown by Government Exhibit 1, Defendant obtained a license to carry a firearm on July 30, 2021, which was later revoked. (Docket No. 66-2). The address associated with Defendant's firearm license was 419 Caldwell Street. (*Id.*).

Finally, as Detective Churilla explained, "if we can't find an individual, then we turn [the case] over to the marshals service." (Docket No. 79 at 52). In this instance, Detective Churilla referred Defendant's case to the United States Marshals in January 2023, and he subsequently was arrested in Johnstown, Pennsylvania in March 2023.[2] (*Id.* at 44, 52, 53).

Moving on to the defense witnesses, Diana Davenport, who is Defendant's aunt, testified that she is familiar with 419 Caldwell Street because that is her mother's home. (Docket No. 79 at 57). Ms. Davenport visited 419 Caldwell Street "mostly every day," thus she had personal knowledge that Defendant was living there and taking care of his grandmother (her mother) from the fall of 2020 until January 2022. (*Id.* at 58-59, 61). In January 2022, Ms. Davenport took over caring for Defendant's grandmother, and he did not permanently reside at 419 Caldwell Street after that time. (*Id.* at 59, 64-65). Nevertheless, Defendant came back to the Caldwell Street address to retrieve his mail "about two days a week" throughout 2022. (*Id.* at 63).

As Ms. Davenport further testified, Defendant was present at 419 Caldwell Street when police officers responded to a 911 call there pertaining to Ms. Davenport and her daughter, which occurred in late January or February 2023. (Docket No. 79 at 64, 65). Finally, Ms. Davenport

---

2   According to the executed arrest warrant, the warrant was received by the United States Marshals Service on January 6, 2023, and Defendant was arrested on March 16, 2023. (Docket No. 14).

testified that no law enforcement officer contacted her to advise that they were looking for Defendant. (*Id.* at 62).

Next, Laneil Davenport, who is Defendant's uncle, testified that he is familiar with 419 Caldwell Street because he is a part owner of the house along with his mother. (Docket No. 79 at 66, 72, 73-74). Mr. Laneil Davenport testified that he visits "every now and then," but he could not recall how often he did so in 2020, 2021, or 2022. (*Id.* at 72). No law enforcement officer contacted him to indicate that they were looking for Defendant. (*Id.* at 74).

Finally, Defendant testified that he was issued a license to carry a firearm on July 30, 2021, which required that he undergo a state and federal background check. (Docket No. 79 at 85). He provided 419 Caldwell Street as the address when he applied for the firearm license, which he never changed. (*Id.* at 85, 88). As for his driver's license, Defendant changed his address in late 2022 for about two or three months to an address in Johnstown, Pennsylvania, ultimately changing it back to 419 Caldwell Street. (*Id.* at 86-88).

In addition to the defense testimony, Defendant entered three exhibits into evidence. Defense Exhibit A is a letter dated April 12, 2023 from the Allegheny County Sheriff's Office addressed to Defendant at 419 Caldwell Street advising that his license to carry a firearm issued on July 30, 2021 was revoked because Defendant had been charged with a criminal offense that barred him from possessing such a license. (Docket No. 66-4). Defense Exhibit B is an Allegheny County Police Department Event Report dated September 2, 2021 concerning a traffic stop involving Defendant, which lists his address as the 400 block of Caldwell Street. (Docket No. 66-5). Defense Exhibit C is a newspaper article from the Pittsburgh Tribune Review dated Monday, March 13, 2023 indicating that Reuben Kelley "was shot and killed Monday morning in Clairton." (Docket No. 66-6).

It the Court's estimation, the foregoing fairly summarizes the witnesses' testimony adduced and the documentary evidence admitted at the evidentiary hearing. Accordingly, with this background, the Court analyzes Defendant's Sixth Amendment speedy trial claim.[3]

## II.  <u>ANALYSIS</u>

The Sixth Amendment provides that in all criminal prosecutions, "the accused shall enjoy the right to a speedy and public trial. . . ."  U.S. CONST. amend. VI.  In *Barker v. Wingo*, 407 U.S. 514, 530-32 (1972), the Supreme Court established a four-factor test for examining whether the constitutional right to a speedy trial has been violated.  "The inquiry focuses on: (1) the length of the delay before trial; (2) the reason for the delay and, specifically, whether the government or the defendant is more to blame; (3) the extent to which the defendant asserted his speedy trial right; and (4) the prejudice suffered by the defendant."  *United States v. Velazquez*, 749 F.3d 161, 174 (3d Cir. 2014) (citing *Barker*, 407 U.S. at 530-31).  None of these factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  *Barker*, 407 U.S. at 533 (emphasizing that the factors "have no talismanic qualities").

---

3       In moving for dismissal of the Indictment, Defendant initially made passing reference to Federal Rule of Criminal Procedure 48(b)(3), (*see* Docket No. 51 at 1), which allows a Court to dismiss an indictment "if unnecessary delay occurs in . . . bringing a defendant to trial."  Fed. R. Crim. P. 48(b)(3).  Defendant subsequently clarified that he is only claiming a Sixth Amendment speedy trial violation and is not proceeding under Rule 48(b)(3) or the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*  (Docket No. 60 at 10) (stating that his "claims are not under . . . the Speedy Trial Act . . . or Rule 48(b)(3) . . . but are made [pursuant to] the Sixth Amendment right to a speedy trial").

       Although Defendant is not proceeding under the rule or the statute, it bears noting that Congress enacted the Speedy Trial Act, which sets "specified time limits after arraignment or indictment within which criminal trials must be commenced," to give effect to the Sixth Amendment right to a speedy trial.  *United States v. Rivera Constr. Co.*, 863 F.2d 293, 295 (3d Cir. 1988).  The protections of the Speedy Trial Act "exceed those of the Sixth Amendment, which does not require that a trial commence within a specified time."  *United States v. Lattany*, 982 F.2d 866, 870 n.5 (3d Cir. 1992).  However, the Speedy Trial Act specifically provides that it should not "be interpreted as a bar to any claim of denial of speedy trial as required by amendment VI of the Constitution." 18 U.S.C. § 3173.  Recognizing that the statute "was enacted largely to make defendants' constitutional speedy trial rights meaningful, many courts have noted that 'it will be an unusual case in which the time limits of the Speedy Trial Act have been met but the sixth amendment right to speedy trial has been violated.' "  *United States v. Alvin*, 30 F. Supp. 3d 323, 340 (E.D. Pa. 2014) (quoting *United States v. Nance*, 666 F.2d 353, 360 (9th Cir. 1982)).  For the reasons discussed herein, this is one such unusual case.

A.     **Length of Delay**

The first *Barker* factor asks whether the delay is of sufficient length to trigger analysis of the remaining factors.[4]  *See Doggett v. United States*, 505 U.S. 647, 651-52 (1992).  Such analysis may be triggered by sufficiently long delays between indictment and arrest.  *United States v. Molina-Garcia*, Crim. No. 20-288, 2022 WL 2116828, at *5 (E.D. Pa. June 13, 2022) (citing *Doggett*, 505 U.S. at 652).  In this case, the delay between the Indictment filed on November 17, 2021 until Defendant's arrest on March 16, 2023 is 16 months, which is sufficient to trigger further review.[5]  *Doggett*, 505 U.S. at 652, n.1 (recognizing that post-accusation delay is " 'presumptively prejudicial' at least as it approaches one year" and triggers full *Barker* analysis); *Hakeem v. Beyer*, 990 F.2d 750, 760 (3d Cir. 1993) ("[A] delay of 14 months is . . . not dispositive in and of itself, but is sufficiently lengthy to warrant an inquiry into the other facts.") (citation omitted).  Consequently, the remaining *Barker* factors must by analyzed.  *Hakeem*, 990 F.2d at 760 (citing *Barker*, 407 U.S. at 530) ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.")).

In conducting the full *Barker* analysis, "the length of the delay is also separately weighed in the court's analysis of the remaining factors."  *Velazquez*, 749 F.3d at 174.  While the delay here of 16 months crosses the threshold of prejudicial delay to justify analysis of the remaining *Barker* factors, such delay is not on the scale the Supreme Court has characterized as "extraordinary."  *See Barker*, 407 U.S. at 533 (describing a delay between arrest and trial of over five years as "extraordinary"); *Doggett*, 505 U.S. at 652 (noting that "the extraordinary 8½ year lag between

---

4       "The speedy trial clock, for Sixth Amendment purposes, begins to run from either the date of arrest or indictment, whichever is earlier, and ends with the commencement of trial."  *United States v. Green*, 516 F. App'x 113, 124 (3d Cir. 2013) (citing *Hakeem v. Beyer*, 990 F.2d 750, 760 (3d Cir. 1993)).

5       The Government does not dispute that the 16-month delay which occurred here triggers a full *Barker* analysis. (*See* Docket No. 88 at 6) (acknowledging that "a sixteen-month delay triggers the four-factor *Barker* inquiry").

Doggett's indictment and arrest clearly suffices to trigger the speedy trial enquiry").  Although Defendant's claim focuses on the delay between Indictment and arrest, it is notable that this is not the type of case where delay would be ordinarily expected or particularly justified, given that it is not a complex, multi-defendant conspiracy case, but rather involves a two-count Indictment charging a drug trafficking offense and a firearm offense against a single defendant.  *See Barker*, 407 U.S. at 531 (explaining that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge"); *United States v. Murrietta*, Crim. No. 20-218-17, 2022 WL 2117766, at *6 (W.D. Pa. June 13, 2022) (observing that "an unusual delay may be justified where the case involves a complex conspiracy") (citations omitted). All told, the delay here of 16 months, while not insignificant, only slightly weighs in Defendant's favor.  With that, the Court turns to consideration of the remaining factors, bearing in mind that "the state, not the prisoner, bears the burden to justify the delay," *Hakeem*, 990 F.2d at 770, when a full *Barker* analysis is warranted.

### B.   <u>Reason for Delay</u>

The second factor, the reason for the delay, is "[t]he flag all litigants seek to capture. . . ." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986).  In considering the second factor, the Court must evaluate who is more at fault for the delay.  *See United States v. Claxton*, 766 F.3d 280, 294 (3d Cir 2014).  The Supreme Court has instructed that "different weights should be assigned to different reasons."  *Barker*, 407 U.S. at 531.  Thus, the Court must calculate the delay attributable to each party and differentiate the delay caused by Defendant from that caused by the Government. *See Claxton*, 766 F.3d at 294.  " '[D]elay caused by the defense weighs against the defendant,' including 'delay caused by the defendant's counsel.' " *United States v. Battis*, 589 F.3d 673, 679-80 (3d Cir. 2009) (quoting *Vermont v. Brillon*, 556 U.S. 81, 90-91 (2009)).  Delay caused by the

Government is grouped into three categories and each carries different weight: (1) "[a] deliberate effort by the Government to delay the trial in order to hamper the defense weighs heavily against the Government;" (2) "[a] more neutral reason such as negligence or overcrowded courts also weighs against the Government, though less heavily;" and (3) "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Claxton*, 766 F.3d at 295 (citation omitted).

In evaluating the reason for the delay where a defendant cannot be found post-indictment, courts assess (1) whether he intentionally evaded prosecution and (2) whether the Government reasonably exercised due diligence to locate him. *Molina-Garcia*, 2022 WL 2116828, at *6 (citing *Velazquez*, 749 F.3d at 178-81). Notably, if "the defendant is not attempting to avoid detection and the government makes no serious effort to find him, the government is considered negligent in its pursuit." *Velazquez*, 759 F.3d at 175 (quoting *United States v. Mendoza*, 530 F.3d 758, 763 (9th Cir. 2008)).

### 1. Defendant's Conduct

Initially, in evaluating the reason for the delay and considering each party's conduct, it is noteworthy that "[a] defendant has no duty to bring himself to trial; the State has that duty . . . ." *Barker*, 407 U.S. at 527; *see also Mendoza*, 530 F.3d at 763 (noting that "it was not [defendant's] responsibility to contact the government during the investigation"). Nonetheless, a finding that a defendant intentionally evaded prosecution may preclude relief. *See Molina-Garcia*, 2022 WL 2116828, at *6. Although intentional evasion in the speedy trial context has not been thoroughly addressed in the Third Circuit, it is relevant to consider whether "changes in [a defendant's] behavior" after an indictment "could be attributed to a deliberate effort ... to evade detection." *Velazquez*, 749 F.3d at 179.

In this matter, the Government submits that law enforcement's efforts to locate Defendant

were frustrated because he did not permanently reside at 419 Caldwell Street, the address that was on his driver's license, from at least January 2022 onward. (Docket No. 84, ¶¶ 31, 58). The Government additionally notes that sometime in late 2022, Defendant changed the address on his driver's license for a few months to an address in Johnstown, but he changed it back to the Caldwell Street address thereafter. (*Id.*, ¶ 32). To the extent the Government seeks to attribute the delay in apprehending Defendant to his own conduct by suggesting that he was intentionally evasive, the record does not support such a finding.

First, the record does not support a finding that Defendant was aware of the Indictment or that he was being sought and then subsequently engaged in intentionally evasive behavior to make it difficult for law enforcement agents to find him. For instance, there is no evidence indicating that Defendant used an alias or false identification or adopted other means to deliberately conceal his whereabouts in an effort to elude the police after the Indictment was filed in November 2021. *Cf. Molina-Garcia*, 2022 WL 2116828, at *7, n.75 (Although a speedy arrest analysis should not focus on a suspect's "transient" lifestyle, "a change in a wanted defendant's living arrangements, when combined with the use of false identification and other evasive behavior, can obviously reflect an attempt to elude police."). Rather, Defendant continued to reside at the Caldwell Street address for two months after the Indictment until January 2022. (Docket No. 79 at 58-59, 61). Thereafter, he apparently moved elsewhere, but he continued to receive his mail at the Caldwell Street address, and he stopped there approximately twice a week throughout 2022 to retrieve his mail. *See e.g., Velazquez*, 749 F.3d at 179 ("A lack of verifiable employment, without more, does not signify an attempt to evade capture, and an individual's choice to receive mail at a post office box or a relative's home does not fill the gap."). Overall, Defendant's continued residence at the Caldwell Street address for two months after the Indictment was filed and his continued

appearance there approximately twice per week throughout 2022 does not support a finding of intentional evasion.

Further, the fact that Defendant briefly changed the address associated with his driver's license from Caldwell Street to a Johnstown location for a few months late in 2022 does not demonstrate intentional evasion. The Caldwell Street address associated with Defendant's driver's license remained the same for approximately one year after he was indicted, Defendant continued to retrieve his mail at that location twice a week during 2022 as discussed, and he changed the address related to his driver's license back to Caldwell Street after only a few months. Moreover, as Ms. Davenport testified, Defendant was present at the Caldwell Street address when police officers responded to a 911 call there pertaining to Ms. Davenport and her daughter, which occurred in late January or February 2023. (Docket No. 79 at 64, 65). All told, Defendant's conduct and lifestyle do not support a finding of deliberate evasion. *See Velazquez*, 749 F.3d at 180 (instructing that the "focus is not the type of life a suspect leads, … but whether the government has diligently used the information available to it").

## 2. <u>The Government's Conduct</u>

"To satisfy the requirement of reasonable diligence, the government does not need to make 'heroic efforts' to pursue a suspect, but it must at least make a 'serious effort.'" *Velazquez*, 749 F.3d at 180 (internal citations omitted). On the record before the Court here, the Government was not reasonably diligent in attempting to locate and apprehend Defendant during the 16 months that elapsed from the Indictment until his arrest.

The Court initially notes that in the 13 months before turning the matter over to the United States Marshals Service, Detective Churilla ***"probably"*** conducted surveillance at the Caldwell Street address "at least a half dozen times" at "various times of days." (Docket No. 79 at 40, 49)

(emphasis added).  The Government elicited no testimony from Detective Churilla to establish the specifics of his surveillance efforts, such as even ***approximately*** when each session occurred or how long it lasted, nor did the Government offer any other evidence to clarify Detective Churilla's rather vague testimony concerning surveillance because he did not take any notes to document his efforts.[6]  In the Court's estimation, "***probably***" conducting surveillance "at least a half dozen times" in 13 months fails to establish reasonable diligence.  *Cf. Molina-Garcia*, 2022 WL 2116828, at *8 ("While [the special agent's] efforts to find Defendant were unavailing, they were extensive and time-consuming . . . .").  Similarly, the Government's indeterminate surveillance efforts are not bolstered by Detective Churilla's uncorroborated testimony that he asked Officer Helinski to notify the other Clairton police officers that there was an arrest warrant for Defendant and to take him into custody if they saw him, that he saw Officer Helinski "daily" and that he asked, "have you guys seen [Defendant] around."  (Docket No. 79 at 39).  Detective Churilla's testimony does little to explain what, if any, efforts, Officer Helinski or the Clairton police took to actively look for Defendant.

Moreover, Detective Churilla conceded that he could have knocked on the door at 419 Caldwell Street, but "it's at [his] discretion how [he] wanted to do it … we could have [knocked], but [he] didn't decide on doing it that way."  (Docket No. 79 at 53).  Although it was within Detective Churilla's discretion to conduct the investigation as he saw fit, his testimony nonetheless indicates that law enforcement did not pursue a potentially viable avenue to gather information

---

6    Detective Churilla testified that he did not have any notes or reports for surveillance at the Caldwell Street address because nothing significant happened.  (Docket No. 79 at 48-49).  As discussed herein, although it was Detective Churilla's discretion to handle the investigation as he saw fit, it would stand to reason that one would have documented law enforcement's efforts to locate Defendant when repeated surveillance attempts and other avenues were unsuccessful.  For instance, such documentation might have included the dates, times, and length of Detective Churilla's surveillance sessions, when Detective Churilla initially reached out to Officer Helinski to alert the Clairton police about an arrest warrant for Defendant, and at least some specifics related to any follow-up Detective Churilla had with Officer Helinski concerning the matter, other than broadly noting that he saw him daily.

concerning Defendant's whereabouts.[7] *See Velazquez*, 749 F.3d at 181 (observing that the police could have attempted to reach the defendant by seeking out a relative to relay a request to turn himself in).  Coupled with Detective Churilla's rather vague surveillance testimony, the Court is compelled to conclude that the Government was not reasonably diligent in its pursuit of Defendant. *See United States v. Beamon*, 992 F.2d 1009, 1013 (9th Cir. 1993) (affirming a district court's finding that the Government "did not act with appropriate diligence" in pursuing a defendant where law enforcement efforts during 17-month delay included "several nights" of driving by and watching defendant's house, knocking on defendant's door, and leaving a message with defendant's wife).

Furthermore, Detective Churilla's testimony concerning certain of Defendant's employment information demonstrates that he failed to "diligently use[] the information available to [him]." *Velazquez*, 749 F.3d at 180.  As an example, Detective Churilla explained that he did not contact United Parcel Service because Defendant was employed there in the third quarter of 2021, but he was no longer employed there when he was indicted in November 2021, which was the last quarter of that year.  (Docket No. 79 at 50).  Detective Churilla's explanation for failing to contact United Parcel Service is contradicted by his own testimony that "the last quarter doesn't get posted until [the next calendar year] because the quarter is not done until December 31." (*Id.* at 41).  Therefore, according to Detective Churilla's own testimony, he would not have known until early in the calendar year of 2022 whether or where Defendant was employed in the last quarter of 2021.  Hence, the information indicating that Defendant was employed at United Parcel

---

7       The Government submits that Detective Churilla's decision not to knock on the door and ask residents about Defendant's whereabouts was reasonable because that could have triggered him to evade arrest and because Defendant allegedly had a gun when he was arrested and was potentially dangerous.  (Docket No. 88 at 9).  Detective Churilla did not cite either of these reasons why he did not knock on the door at the Caldwell Street address.  He simply testified that he could have knocked, but he decided not to proceed in that fashion.  (Docket No. 79 at 53).

Service in the third quarter of 2021 would have been the most current employment information available when Defendant was indicted in November 2021, and presumably directly relevant to Detective Churilla's investigation and search for him late in 2021 following the Indictment. Detective Churilla acknowledged the potential viability of the employment information for the third quarter of 2021 when he stated that "we could have used – went through United Parcel Service and attempted to identify where he was living at," but he did not follow up on that information following Defendant's indictment in November 2021.  (*Id.* at 42, 46).

Finally, Detective Churilla "believe[d]" that Officer Brown ran social media searches to identify whether and where Defendant was working.  (Docket No. 79 at 53).  However, the Government elicited no additional testimony or evidence to verify Detective Churilla's belief that any such social media searches actually were conducted, let alone any specifics concerning same.

On this record, the Court is unable to conclude that the Government's efforts in pursuing and arresting Defendant were reasonably diligent, particularly given that Defendant did not engage in intentionally evasive conduct as discussed above.  Overall, Detective Churilla's testimony describing law enforcement's surveillance and employment and social media research, including his concession that certain avenues were not pursued, does not demonstrate that the Government made a serious effort to locate Defendant after he was indicted and until the case was turned over to the Marshals.  *See e.g., United States v. Weaver*, 949 F. Supp. 2d 73, 82 (D.D.C. 2013) ("In this case, the numerous steps that the government could have taken but did not, suggest a decidedly dilatory approach to their constitutional obligation to bring [the defendant] to trial. The government's efforts were too few and largely ineffectual.").  Accordingly, the Court finds that the Government was negligent in its pursuit of Defendant, and the reason for the delay therefore weighs convincingly in his favor.

### C. **Assertion of Speedy Trial Right**

Next, the third *Barker* factor requires the Court to assess " '[w]hether and how a defendant asserts his [speedy-trial] right,' including 'the frequency and force' of such assertions." *Velazquez*, 749 F.3d at 181-82 (quoting *Barker*, 407 U.S. at 529, 531). This factor permits "a court to attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client, or from a situation in which no counsel is appointed. It would also allow a court to weigh the frequency and force of the objections as opposed to attaching significant weight to a purely pro forma objection." *Barker*, 407 U.S. at 529.

When a defendant is represented by counsel, "he should identify 'a motion or some evidence of direct instruction to counsel to assert the right at a time when formal assertion would have some chance of success.' " *Battis*, 589 F.3d at 681 (quoting *Hakeem*, 990 F.2d at 766). However, a *pro se* defendant "does not have to make a procedurally perfect assertion of his speedy trial rights, but must make a reasonable assertion of the right so as to put authorities on notice of his Sixth Amendment claim." *Id.* (quoting *Douglas v. Cathel*, 456 F.3d 403, 418 (3d Cir. 2006)).

There is no dispute here that Defendant timely and forcefully asserted his speedy trial rights as shown by his request in July 2023 to proceed *pro se* so that he could pursue his constitutional speedy trial claim. (Docket No. 51, ¶¶ 19-20). Defendant ultimately filed his Delay Motion clearly asserting a Sixth Amendment speedy trial violation in August 2023, just five months after his arrest.[8] *See Velazquez*, 749 F.3d at 184 (finding that speedy trial motion brought within four months of the defendant's arrest weighed in his favor). Consequently, this factor firmly weighs in

---

[8]    The Assistant United States Attorney stated at the hearing that the Government "will concede that [Defendant] has swiftly asserted his speedy trial right." (Docket No. 79 at 112).

Defendant's favor.

### D. Prejudice Suffered by Defendant

The final factor to consider is prejudice to Defendant from the delay. *Barker*, 407 U.S. at 532. A defendant who claims a speedy trial violation bears the burden of showing prejudice and cannot simply rely on the "possibility of prejudice." *Hakeem*, 990 F.2d at 760 (citation omitted). "A defendant can establish specific prejudice by showing that he was subject to 'oppressive pretrial incarceration,' that he suffered 'anxiety and concern' about the impending trial, or that his defense was impaired as a result of the delay." *Battis*, 589 F.3d at 682 (quoting *Barker*, 407 U.S. at 532). The Supreme Court has acknowledged that excessive delay can lead to a presumption of prejudice,[9] but added that "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria . . . it is part of the mix of relevant facts, and its importance increases with the length of delay." *Doggett*, 505 U.S. at 655-56 (internal citation omitted).

Here, Defendant claims specific prejudice, contending that his defense has been impaired because of the delay.[10] According to Defendant, a witness who would have provided exculpatory testimony passed away prior to his arrest, and he had no reason to believe that it would have been necessary to preserve that witness' testimony given that the state case against him had been

---

9       To that end, the Supreme Court ruled that a pretrial delay of over eight years was long enough to presume that the defendant would be prejudiced by the delay. *Doggett*, 505 U.S. at 657-58. The Third Circuit Court of Appeals has held that "prejudice will be presumed when there is a forty-five-month delay in bringing a defendant to trial, even when it could be argued that only thirty-five months of that delay is attributable to the Government," *Battis*, 589 F.3d at 683, whereas "a delay of sixteen and a half months is insufficient to presume prejudice." *United States v. Villalobos*, 560 F. App'x 122, 127 (3d Cir. 2014). Given the 16-month delay that occurred here, a presumption of prejudice is inapplicable.

10      Defendant was not incarcerated until he was arrested on March 16, 2023, and there is no evidence that he was aware of the Indictment against him before that date. Therefore, specific prejudice in the form of oppressive pretrial incarceration or anxiety and concern are inapplicable in this case.

dismissed and he was unaware of the federal case.  (Docket Nos. 51, ¶¶ 8-12, 18; 86 at 10-11; 90 at 6, 12-13).

"[T]he possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence" is the most serious form of prejudice "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  *Doggett*, 505 U.S. at 654 (internal quotation marks and citations omitted).  However, the Supreme Court has recognized that "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown."  *Id.* at 655.  "To establish that his defense was specifically prejudiced by the delay, a defendant cannot rely on general allegations."  *United States v. Green*, 471 F. Supp. 3d 577, 601 (M.D. Pa. 2020) (citing *Hakeem*, 990 F.2d at 763).  Further, "[s]peculative and conclusory assertions cannot satisfy a defendant's burden of showing specific prejudice due to impairment of his defense."  *Id.*

In claiming he has been prejudiced by the delay that occurred here, Defendant has not simply relied on general allegations, nor has he failed to specify the content and relevance of the lost testimony.  *Cf. United States v. Shulick*, 18 F.4th 91,102-03 (3d Cir. 2021) (finding no prejudice was established due to a witness' unavailability where the defendant failed to substantiate that witness' testimony would have been important to his defenses); *Green*, 471 F. Supp. 3d at 603 (finding no specific prejudice to defense where the defendant relied only on general, conclusory allegations concerning length of delay and possibility that it could affect witnesses' memories).  Rather, he identified Reuben Kelley as a witness who he would have presented at trial to provide potentially exculpatory testimony indicating that Kelley was responsible for the drugs found in the vehicle Defendant was driving.[11]  *See United States v. Koller*, 956 F.2d 1408, 1414 (7th Cir. 1992)

---

[11]    Because of the delay that was caused by the Government's negligent pursuit of Defendant, a jury would be deprived of hearing Mr. Kelley's anticipated testimony and determining what weight, if any, to give it.  Under these

(the defendant's general allegation that his witnesses' memories faded during the delay was not sufficiently specific to show actual prejudice, but the allegation that two of his witnesses became unavailable was specific).[12]   However, as shown by Defense Exhibit C, Mr. Kelley was shot and killed on March 13, 2023 just days before Defendant was arrested in this case.   *See Barker*, 407 U.S. at 532 ("If witnesses die or disappear during a delay, the prejudice is obvious.").   Moreover, Defendant justifiably explained that he had no reason to believe there was any need to preserve Mr. Kelley's testimony given that Defendant's state court case was *nolle prossed* in June 2021, and he was unaware of the federal Indictment until he was arrested in March 2023.   *Cf. Hakeem*, 990 F.2d at 764 (while the defendant in *Doggett* apparently was "unaware of the charges pending and so had no reason to prepare a defense[,] Hakeem knew from the day of the robbery that it would be necessary to preserve his alibi") (internal citation omitted); *Molina-Garcia*, 2022 WL 2116828, at *10 (finding prejudice was mitigated where the defendant had "actual and immediate notice of the need to preserve evidence").   Under these circumstances, the Court finds that Defendant's ability to present potentially favorable evidence has been impaired.   *See United States v. Pinnock*, Crim. No. 3-260, 2012 WL 1788177, at *3 (W.D. Pa. May 17, 2012) (finding prejudice where a witness who would have testified that the defendant was not involved in charged conspiracy had been deported, and observing whether a jury would have believed such account was not for the court to decide because it was "clear that the passage of time impaired [the

---

circumstances, the Court is unable to rule out the possibility that such testimony could have created a reasonable doubt for some member of the jury.

12        Although the defendant's allegation that two of his witnesses became unavailable was specific, the *Koller* court found that the unavailability had little effect at trial and thus cut against a finding of prejudice.   *Koller*, 956 F.2d at 1414.   As to one unavailable witness, another witness testified at trial to the same events that the unavailable witness was expected to testify.   *Id.*   As to another deceased witness, a transcript of his grand jury testimony was available and three other witnesses testified at trial concerning the same subject matter of the deceased witness' testimony.   *Id.* Unlike *Koller*, there is nothing in the record before the Court here to indicate that another witness could provide similar testimony to that of Reuben Kelley, and Defendant was not on notice that there was any need to preserve his testimony.

defendant's] ability to present favorable evidence").   Accordingly, the Court concludes that Defendant's defense has been prejudiced because of the delay caused by the Government's negligence in pursuing and apprehending him, thus the final *Barker* factor weighs in his favor.

In sum, the four *Barker* factors support Defendant's claim of a violation of his Sixth Amendment speedy trial right.   To summarize, the length of the delay from Indictment to Defendant's arrest – 16 months – is attributable to the Government because it was not reasonably diligent in pursuing him.   Therefore, "the reason for the delay, the second and most important factor in the speedy trial analysis, strongly favors . . . [D]efendant." *Velazquez*, 749 F.3d at 186. Defendant timely asserted his speedy trial rights, which weighs squarely in his favor.   Finally, Defendant has established specific prejudice to his defense, that is, the loss of his ability to present potentially favorable evidence because of the delay, which also favors him.

"The remedy for a Sixth Amendment speedy trial violation is to dismiss the indictment with prejudice, and that is the remedy that this Court will impose." *Alvin*, 30 F. Supp. 3d at 350 (citing *Velazquez*, 749 F.3d at 167, 186) (reversing district court's denial of the defendant's motion to dismiss on Sixth Amendment speedy trial grounds and remanding with instructions to dismiss the indictment with prejudice); *see also United States v. Okoro*, Crim. No. 1:12-CR-0241, 2023 WL 2742737, at *1 (M.D. Pa. Mar. 31, 2023) (dismissing indictment with prejudice because of Sixth Amendment speedy trial violation).   In imposing this remedy, the Court is cognizant of the significance of dismissing the Indictment against Defendant. *See Velazquez*, 749 F.3d at 186.   On the one hand, an individual who is alleged to have engaged in drug trafficking and unlawful firearm possession will not have to answer the charges contained in the Indictment.   On the other hand, the Court risks approving the Government's lack of diligence in pursuing and arresting an individual, thereby resulting in prejudice to his defense, and the curtailment of his liberty through

continued incarceration.  On balance, under the particular circumstances of this case, the Court concludes that the *Barker* factors weigh in favor of finding that Defendant has been deprived of his Sixth Amendment right to a speedy trial.  Consequently, dismissal of the Indictment is the "necessary cost for the protection of the speedy trial right set forth in the Constitution."  *Id*.

III.   **CONCLUSION**

For the reasons set forth herein, Defendant's Motion to Dismiss for a Violation of the Constitutional Right to a Speedy Trial and Unnecessary Delay in Bringing a Defendant to Trial and Violation of a Fair Trial, (Docket No. 51), is granted, and the Indictment in this case is dismissed with prejudice.  In light of this ruling, Defendant's other Pretrial Motions, (Docket Nos. 50, 53, 54), are denied as moot.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Date:   April 3, 2023

cc/ecf:  All counsel of record

Dyran Davenport (via U.S. mail)
Reg. No. 49438510
Butler County Prison
202 S. Washington Street
Butler, PA  16001